1

2

3

4

5               UNITED STATES DISTRICT COURT

6                  EASTERN DISTRICT OF CALIFORNIA

7  JUAN ANTONIO JAIMES,                )   1:06-CV-01080 OWW JMD HC
                                       )
8               Petitioner,            )   FINDINGS AND RECOMMENDATION
                                       )   REGARDING PETITION FOR WRIT OF
9      v.                              )   HABEAS CORPUS
                                       )
10  M.C. KRAMER,                       )
                                       )
11              Respondent.            )
                                       )
12  _____ )

13        Petitioner Juan Antonio Jaimes ("Petitioner") is a state prisoner proceeding pro se with a

14  petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

15                      **PROCEDURAL BACKGROUND**

16        Petitioner is currently in the custody of the California Department of Corrections and

17  Rehabilitation at Folsom State Prison, pursuant to a judgement of the Fresno County Superior Court.

18  (Pet. at 2).   Petitioner was convicted by a jury in August 2003 of attempted murder with malice

19  aforethought (Cal. Penal Code §§ 664 and 187(a)) and assault with a deadly weapon (Cal. Penal

20  Code § 245(a)(1)).   (Answer Mem. P. & A. at 4).   The jury further found as true a sentence

21  enhancement for infliction of great bodily harm in the commission of the two offenses (Cal. Penal

22  Code § 12022.7(a)), resulting in an aggregate sentence of twelve years.   (Pet at 2; Answer at 1-2).

23        Petitioner appealed his conviction to the California Court of Appeal.   The state appellate

24  court affirmed Petitioner's conviction in a reasoned opinion on March 29, 2005.   (Pet. Ex. B).

25        Petitioner filed a petition for review to the California Supreme Court on May 6, 2005.   (Pet.

26  Ex. A).   The California Supreme Court summarily denied the petition on June 14, 2005.[1]   (Id).

27  _____

28        [1]Respondent admits that Petitioner has timely filed and exhausted the claims he is currently seeking habeas corpus
   relief for.  (Answer at 2).

1   On August 11, 2006, Petitioner filed the instant federal petition for writ of habeas corpus

2   with the Court.  (Pet. at 1).  The petition sets forth two grounds for habeas corpus relief, specifically

3   contending that insufficient evidence was presented at trial to convict Petitioner for attempted

4   murder and that the trial court's failure to issue jury instructions for attempted voluntary

5   manslaughter violated his right to due process of the law.

6   On July 19, 2007, Respondent filed an answer to the petition.

7   **FACTUAL BACKGROUND**[2]

8   On the afternoon of November 21, 2002, Reynaldo Mendez (Mendez) and his
    wife, Alicia (Mrs. Mendez), were with their friend, Samuel Vega. They were driving
9   around in the Mendezes' white Chevrolet and stopped to see a friend. The friend was
    not home and they drove to a nearby "Super 7" convenience store at Maple and
10  Belmont in Fresno to buy beer. None of them had been drinking that day.

11  Mrs. Mendez parked the car in front of the store and Mendez went inside to
    purchase the beer. Mrs. Mendez testified two men were standing next to a pickup
12  truck, which was also parked in front of the store. Mrs. Mendez did not know the
    men, but subsequently identified them as appellant and codefendant Francisco
13  Barrales. Mrs. Mendez testified appellant and Barrales stared at Mendez "in an
    awkward way" as he entered the store. Appellant and Barrales then followed Mendez
    into the store.

14  Mendez testified that when he got out of the car, he noticed the two men
    standing next to the truck but he did not know them. Mendez subsequently identified
15  the men as appellant and codefendant Barrales. They were speaking to someone in the
    truck. Mendez walked by them and entered the store.

16  Samuel Vega had remained in the car with Mrs. Mendez, but he also saw the
    men stare at Mendez and decided to join his friend in the store. Vega walked to the
17  cigarette display and accidentally bumped into the men. Vega testified the men acted
    "like they owned the aisle." Vega said "[e]xcuse me," but one man kept looking at
18  him. Vega asked if the man knew him, and the man said no. Vega replied, "Then
    what's up?" The man told Vega they should take it outside.

19  As Mendez selected the beer, he heard Vega say "why you looking at my
    homeboy like that." Mendez turned around and saw the same two men inside the
20  store. Vega's comments were directed to appellant, and seemed to indicate that
    appellant was staring at Mendez. Mendez never saw the men staring at him, and
21  neither appellant nor Barrales gave him any trouble while they were in the store.

22  Mendez went to the counter and paid for the beer, and heard a "big smack" as
    one of the men punched Vega in the back of the head. Vega asked, "why you hit me
23  like that when my backs turned," and everyone started to argue. Mendez told Vega
    not to argue with "these fools."

24  Vega testified appellant stared at him, called him "a buster," and said he and
    the "ese's" owned this town. Appellant called out Vega to fight. Vega refused and
25  purchased the cigarettes, then suddenly felt the punch in the back of his head. Vega
    asked appellant why he "sucker punched" him, and said if "that's what he wanted to
26  do we can handle it," and called appellant outside to fight. Mendez told Vega to forget
    about it.

27  _____

28  [2]The facts are derived from the factual summary set forth by the California Court of Appeal, Fifth District, in its
    unpublished opinion issued on March 29, 2005, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).

Mendez and Vega emerged from the store with the beer. Appellant and Barrales also walked out of the store, and they were arguing with Vega. Mrs. Mendez was still in the car and she heard Vega say "come outside and just stuff like that." Mendez leaned into the car, handed the beer bottles to Mrs. Mendez, and told her to lock the car doors and close the power windows. Mendez and Vega remained outside the store.

Mrs. Mendez testified appellant and Barrales went back into the store, and she observed them through the clear storefront windows as they seemed to hand something to each other. Mrs. Mendez thought they had a gun or some type of weapon, and she told Vega and her husband to get back into the car. Mendez also observed appellant and Barrales place their hands in their pockets, as if they had a gun or a knife. Mendez testified appellant kept moving his hands up and down in his pockets, as if he had a gun. Mr. Mendez thought they were going to get shot. Vega also saw appellant and Barrales hand something to each other, as if they were passing a knife between them.

Appellant and Barrales emerged from the store, and appellant argued with Vega. Mrs. Mendez testified appellant called Vega "a buster or something like that." Mendez told Vega to leave it alone, "they're little bitches, you know," and warned Vega that they might pull a gun. Mendez testified appellant and Barrales were "woofing with their hands in their pockets" and "talking shit." The men bragged that Fresno was a Sureno town. Mendez testified appellant said "Surenos run this town and this and that and trese, and I don't care if I'm on parole and this and that, and start barking like that. And we were just saying, you know what, hey, you guys, no guns, no knives we'll take it to the side and fight, and they did."

Mendez testified that he suggested the men have a fight to settle their dispute: "Well, I'm the one who said because my friend is the one who got socked in the back of the head and nobody likes to get socked in the back of the head, you know. So the guys are right there telling me in the store so be a man about it and let's fight outside of the store and once you fight, squash it. That's it. No more. That's as far as that went. That's what happened."

Vega testified that Mendez initially tried to get him to leave, but then he told Vega they should just fight one-on-one because appellant and Barrales kept coming at them.

Mrs. Mendez testified the four men moved to a dirt lot on the side of the store and started to fight. Either appellant or Barrales whistled to a man who was standing across the street at an apartment complex, and motioned for that man to join the fight. The man crossed the street and joined the others on the side of the building, and watched the fistfight between appellant and Vega.

Vega testified he told appellant "it was going to be a one-on-one thing and he took it as far as he wanted to." Mendez testified he watched as Vega and appellant fought each other in a fistfight. No one used any weapons. Mendez did not join the fight, and he warned Barrales and the other man not to get involved or he would jump in. Neither Barrales nor the other man helped appellant during the fight. Mendez testified Vega was bigger than appellant, and the fight ended with appellant "on the ground, bloody nose." Vega did not beat up appellant but "just gave him a bloody nose" and "dropped him" to the ground. Mendez told Vega "that was enough" and the fight ended.

Mendez testified appellant rose from the ground, and Vega exchanged words with appellant like "fuck you bitch or something like that." Mendez testified: "... We didn't know what was going to happen. After you get in fight your temper is flaring, your heart is beating. Hell, my friend got socked. We thought we were going to get shot up, we thought we were going to get jumped. Only the normal thing to do, you know, after your friend beat somebody up. It's not like we're taunting them or nothing."

Mendez did not say anything to appellant.

In the meantime, Mrs. Mendez could not see what was happening and moved her car around the side of the store, and she saw appellant and Vega fistfighting. She shouted at Vega and her husband to get out of there. Mrs. Mendez testified her husband told Vega "that was enough already" and tried to stop the fight. Mrs. Mendez did not pay attention to which person was winning the fight and did not notice if anyone was on the ground.

Mrs. Mendez testified the fight ended within a few minutes, and some words were exchanged between the men. Mendez and Vega returned to the car, and Mrs. Mendez "just took off" down Belmont. Mrs. Mendez testified she did not hear Vega shout or make any "bulldog" noises as they drove away. Vega thought the entire incident was over when they left the parking lot in their car.

As Mrs. Mendez pulled out of the parking lot, however, she observed appellant and Barrales enter a gold sedan and follow their car. Mendez and Vega also saw appellant and Barrales get into the gold sedan, which accelerated and followed the Mendezes down Belmont. Mrs. Mendez repeatedly changed lanes and tried to lose them, but the gold sedan weaved in and out of lanes and stayed behind them. When Mrs. Mendez stopped at a red light at Peach and Belmont, the gold sedan stopped right behind her, the doors opened, and the occupants started to get out of the car. The light changed and Mrs. Mendez accelerated and again tried to lose them, but the gold sedan stayed right behind them. Mrs. Mendez believed there were three people in the gold car.

Mrs. Mendez stopped at another red light at Clovis and Belmont. The gold sedan again stopped right behind her, and someone emerged from the passenger side and ran to the Mendezes' Chevrolet. Mendez was sitting in the front passenger seat and had opened the window. Mr. Vega was in the backseat. Mrs. Mendez testified that appellant appeared at the open window on the front passenger side, leaned his head and arm into the window, and plunged a knife into Mr. Mendez's chest.

Vega testified appellant and Barrales both got out of the car and ran toward the Mendezes' vehicle. Appellant leaned into the window like he was swinging and punching Mendez, and Vega did not realize Mendez had been stabbed. Vega subsequently guessed that appellant believed Vega was sitting in the front seat. Vega pulled out his own pocketknife but he left it in the backseat and never used it.

Mendez testified that when they stopped at the red light, he watched from the passenger's side mirror as appellant emerged from the gold sedan. "... Next thing I know I see [appellant] running up along my side in that little rear view mirror. And now I know why it says objects are closer than they seem because next thing I know I felt something in my chest like that. I look down and I seen the knife. I looked up in his eyes and he like paused and he went back and tried to grab the knife again and that's when my wife took off."

Mendez testified appellant's head, shoulder, and arm were inside the car, and he held the knife in his right hand as he stabbed Mendez. Appellant did not say anything as he stabbed him. Mendez testified he looked directly at appellant's face, and appellant seemed surprised as he stabbed him. Appellant released the knife, held on to the door, and paused for a moment, as if he was going to reach in and grab the knife.

Mrs. Mendez believed another person emerged from the driver's side of the gold sedan as appellant stabbed her husband. Vega was trying to get out of the backseat but Mrs. Mendez immediately accelerated away from the intersection and headed for University Medical Center (UMC). Mendez was bleeding and shaking, and thought he was going to die. He told his wife that he loved her and his family, and he passed out. Mrs. Mendez pulled into a liquor store and screamed for help, and someone from the store called 911.

Around 5:00 p.m., Fresno Police Officer Tracy Olivar was dispatched to Dorsey's Liquor Store at Tulare and Chestnut. The Mendezes' white Chevrolet was parked near the store. Mrs. Mendez ran toward Officer Olivar and shouted that her

1    husband had just been stabbed. Officer Olivar tried to speak to her but she was
     hysterical, and she repeatedly screamed that her husband had been stabbed and he was
2    not in a gang.
            Officer Olivar approached the car and found Mendez sitting in the front
3    passenger seat with the knife handle sticking out of his chest. Olivar could not see the
     blade, which was plunged into Mendez's chest, but observed large amounts of blood
4    on the knife's four-inch wooden handle and on the passenger seat. Mendez's head was
     falling to the side, and he repeatedly said that he could not breath. Officer Olivar
5    entered the backseat and held up Mendez's head as they waited for the ambulance.
     The ambulance arrived within five to eight minutes.
6           Mendez survived the knife wound, which punctured the pericardium, the sack
     surrounding the heart. The knife's blade was about two inches long and the actual
7    puncture left a small scar, but Mendez was left with a large "zipper" surgical scar
     from his collar bone to his stomach. There were 52 staples used to close the surgical
8    area, and additional staples were used inside the wound and where a breathing tube
     was inserted. He lost five pints of blood and the doctors thought he would not survive.
9    He was unconscious for several days, and spent five days in the hospital.
            Officer Brett Vestal interviewed Samuel Vega at Dorsey's Liquor Store, and
10   learned the entire incident began at the Super 7 convenience store. Officer Vestal
     subsequently contacted the clerk at the Super 7 store, who stated there was a
11   disturbance inside the store and he told the men to take it outside. The clerk turned
     over the store's security videotape.
12          On February 17, 2003, Officer Raymond Camacho arrested codefendant
     Barrales, advised him pursuant to Miranda v. Arizona (1966) 384 U.S. 436 warnings,
13   and conducted an interview. Barrales stated he had been at an apartment complex and
     walked across the street to the Super 7 store to look at magazines. While he was
14   inside the store, another man entered and made comments regarding the Bulldog
     gang. This man got into a fight with another person. At that point, an unknown person
15   pulled into the store's parking lot with a young child. Barrales stated he did not know
     that someone had been stabbed during the incident. Barrales started to cry and pray
16   during the interview, and insisted he was not in the car and did not know anything
     about the stabbing.
17          Officer Camacho testified Barrales subsequently changed his story, and said
     that Jose Davila was driving the car which followed the victim, but still insisted that
18   he was not in that car and did not know about the stabbing.

19   ***Jose Davila's Testimony***
            Appellant, Barrales, and Jose Davila were arrested and charged with count I,
20   attempted murder, and count II, assault with a deadly weapon, with enhancements for
     personal infliction of great bodily injury and for the offense being committed for the
21   benefit of a criminal street gang.
            At some point prior to trial, Davila pleaded guilty to being an accessory after
22   the fact (Pen.Code, § 32), with the understanding that he would not serve time in
     prison on condition he testify truthfully at trial as a prosecution witness. Davila
23   entered the witness protection program because appellant threatened him while they
     were in custody together. Appellant told Davila that he was on appellant's "hit list"
24   and someone was going to kill him.
            Davila testified that on the afternoon of November 21, 2002, he was at home
25   and working on his car when Barrales called and asked for a ride. Davila agreed and
     drove to the Super 7 store to pick him up. Davila took his five-year-old son with him
26   for the ride.
            Davila testified that when he pulled into the store's parking lot, appellant was
27   fighting with another man. Davila did not know appellant prior to this incident.
     Barrales and another man were standing near appellant as the fight ensued. Barrales
28   was holding something, but he was not involved in the fight. Davila testified

appellant's opponent hugged appellant and "kneed" him in the face, and appellant fell down. Davila saw a man run to a white car. Barrales ran to Davila's car and said that one of the men in the white car took appellant's wallet. Appellant and Barrales asked Davila to follow the white car so they could get the license plate.

Davila testified appellant and Barrales got into his car, and he complied with their directions to follow the white vehicle. Davila was scared and worried that Barrales was going to do something "gang-related" because Barrales was very upset and acting aggressive. Barrales was in the Surenos and he was known as "Soreno Boy." Davila used to be involved with the Surenos but left the gang.

Davila testified he followed the white car, switched lanes, and finally caught up at Belmont and Clovis. Davila thought appellant and Barrales just wanted to read the white car's license plate number, and did not believe they were going to assault or attack the alleged thief. Appellant and Barrales got out of Davila's car and ran toward the passenger side of the white vehicle. Appellant ran in front of Barrales. Appellant and Barrales then returned to Davila's car and told him that the other people had a gun, and Davila took off. As Davila drove away, a woman emerged from the driver's side of the white car, and she was screaming and crying. Davila never saw appellant or Barrales with a knife.

Davila testified he pulled over a few streets away, and told appellant and Barrales to get out of his car because they placed his child in danger. They refused to leave, and told Davila to drive them toward the fairgrounds. Davila complied and dropped them off at a fast food restaurant.

On cross-examination, Davila denied that Barrales called him that day to obtain some crank, or that he regularly supplied Barrales with narcotics. Davila testified Barrales just asked for a ride that day. Davila never heard appellant or Barrales say any gang-related phrases during the entire incident.

***Additional Trial Evidence***

At trial, Mrs. Mendez testified she had no doubt that appellant and Barrales were the two men who confronted Vega and her husband at the store, and that appellant stabbed her husband in the car.

Mrs. Mendez testified she spoke to several officers that night, but she was hysterical and could not remember what she said. She recalled that the officers asked her if her husband was involved in gangs, and that's why she repeatedly said her husband was not in a gang. Mrs. Mendez testified she was somewhat familiar with gangs because Vega and her brothers were in the Bulldogs. Her husband had never been involved with street gangs.

Mendez testified he was familiar with gang members from the neighborhood, but he was not involved with any gangs and stayed away from such activities. Mendez knew Vega was associated with the Bulldogs, but Vega was trying to straighten out his life at the time of the incident. Mendez testified that none of them had any weapons that day.

The security videotape from the Super 7 store was played at trial and Mendez narrated the scenes which depicted appellant entering the store behind Mendez, appellant exchanging words with Vega, and appellant moving his hands in and out of his pockets.

At trial, Vega identified appellant as the person who challenged him in the store, who fought with him outside the store, and who stabbed Mendez in the car. Vega believed the fight outside the store was in his own self-defense because appellant punched him inside the store.

Vega testified he previously belonged to Bulldogs and served time in prison for a felony. Vega believed appellant singled him out because Vega happened to wear a burgundy shirt that day. Vega was no longer affiliated with the Bulldogs, however, and he did not claim any gang affiliation during the encounter with appellant and Barrales. Vega testified the store incident was just a personal confrontation and not

related to any gang issues.

Vega testified that a few weeks before the trial, he received a three-way telephone call around 11:00 p.m. One person identified himself as the man who stabbed Mendez, and he wanted Vega to know where he was coming from. The man asked if Vega understood what would happen if Vega testified against him, "that [the man] had a daughter and all this." The man said that "everybody makes mistakes and stuff." Vega replied that he did not make that kind of mistake, that they left the scene after it was over, and the men continued the altercation. Vega asked how the caller obtained his telephone number, and the man replied "he got it from his attorney." The man kept asking to speak with Vega about the incident and Vega refused. Vega believed the man did not want him to testify. Vega testified a second voice joined the three-way telephone call, and asked if Vega knew what was going to happen if Vega ever got to Wasco or went to prison.

After the telephone call, Vega was nervous and worried that someone might get him or his family if he testified, and reported the telephone call to the police. Vega realized the callers considered him a snitch, but "I ain't no snitch because I'm the victim." The two men tried to make him feel guilty about what would happen to appellant if Vega testified in the case.

Nancy Serrano testified about the telephone call received by Vega. On the evening of July 17, 2003, she received a telephone call from her boyfriend, Armando Porras, who asked her to make a telephone call for "Guero," later identified as appellant. She complied and appellant got on the telephone. She overheard someone tell "Samuel" what would happen if he went to Wasco.

Detective Jessie Ruelas testified as an expert on criminal street gangs. Ruelas testified that based on the state criminal gang database, tattoos, and other indicia, appellant was a member of a large Sureno gang in Los Angeles, and Barrales and Davila were also associated with Sureno gangs. Samuel Vega was a self-admitted member of the Bulldogs.

Detective Ruelas explained that appellant used several gang-related phrases during the incident at the store. A "buster" is a derogatory term used by gang members to describe a rival. The phrase "what's up" is used by rival gang members to challenge each other. The word "esse" is a term of endearment used within the gangs. Appellant's statement that "Sorenos rule this town" was a challenge to a rival gang member that Fresno was now his town. Detective Ruelas believed Mendez was stabbed as the result of a gang-related incident because someone felt a lack of respect based on the incident at the store.

### Defense Evidence

Appellant testified at trial and admitted that he stabbed Mendez, but denied that he intended to kill Mendez or the incident was gang-related. Appellant testified he was unwillingly jumped into a Los Angeles gang when he was 13 years old, but admitted he willingly obtained gang-related tattoos. He served time in the California Youth Authority (CYA) for robbery, and decided to leave the gang after he took some gang awareness classes and went through a drug treatment program. He also tried to have the tattoos removed from his body. He was released on parole from CYA in May 2002, and never participated in any gang activities after that time.

Appellant met codefendant Barrales in August 2002, when he asked Barrales to give him new tattoos to cover his gang-related tattoos. At the time of the incident in the store, appellant was going to Quality College to become a truck driver.

On the afternoon of November 21, 2002, appellant was at Barrales's house and they were looking at magazines to get ideas for different tattoos. They were also snorting crank. Appellant had a kitchen knife which he used to cut the narcotics. They got high and ran out of crank.

Appellant testified they went to an apartment complex to see friends. Barrales used the telephone and called "Spooky" to purchase more crank, and arranged to meet

"Spooky" at the Super 7 store across the street. Appellant and Barrales crossed the street to the store and spoke to a guy in a pickup truck who was interested in getting a tattoo. They entered the store and went to the magazine rack to get ideas for tattoos, and waited for "Spooky" to arrive with the drugs. Appellant still had the kitchen knife in his pocket. "Spooky" was late and Barrales called him again.

Appellant testified Vega entered the store and bumped into him. Appellant did not know Vega. Vega did not apologize for bumping him, and appellant did not stare at him. Instead, Vega approached appellant and Barrales and asked why they were staring at him. Appellant ignored Vega but Barrales exchanged words with him. Vega got into appellant's face and said, " 'Do you fucking know me from somewhere?' " and " 'Let's take it outside. You fucking think you know me from somewhere. You're looking at me, mad dogging me or whatever.' " Appellant told Vega that he was on parole and did not want any problems.

Vega again got into appellant's face and called him names. Appellant denied hitting Vega on the back of the head, but admitted he "socked [Vega] on the side of the jaw" with a closed fist. Appellant hit Vega because Vega "got in my face" and called him names, and it had nothing to do with any gang activity. Appellant insisted he never exchanged gang taunts with anyone in the store.

Appellant testified he "squared off" to get ready for Vega to "do something back." Vega kept challenging appellant to " 'take it outside little bitch.' " Appellant hesitated because Vega was a larger man. Appellant went outside, then returned inside the store because he thought it was safer inside. He finally decided to accept Vega's challenge but first took off his white lace-up "Lugs" shoes because they were very heavy and he wanted to be quick on his feet. He also removed the kitchen knife from his pocket. Appellant testified he handed the knife to Barrales while they were inside the store, and gave his shoes to Barrales when they went outside. Appellant gave his knife to Barrales so no one would get hurt during the fistfight. Barrales apparently placed the knife inside the shoes.

Appellant testified he fought with Vega outside the store while Barrales and Vega's friend watched. Barrales whistled to a friend from across the street, and he also joined them and watched the fistfight. Appellant was upset that he had to fight because Vega was twice his size, but "after I socked him [in the store] I realized I'm going to have to take it outside." Appellant never landed a punch during the fistfight. Vega immediately grabbed appellant pulled his shirt over his head, and kneed and kicked him. Appellant fell to the ground, and his nose was bloody and broken.

Appellant testified that after the fight, Vega and his friend said something about the Bulldogs, and " 'That's the way we do it in Fresno,' some shit like that." Vega and his friend ran to the white car and left. Appellant admitted no one took his wallet during the fight.

Appellant testified an "unknown subject" pulled into the store's parking lot and Barrales ran toward that car. Barrales entered the front passenger seat and appellant joined him in the car because Barrales still had his shoes and the knife. Jose Davila was the driver. Appellant did not know Davila, and Barrales introduced them during the car chase. Appellant testified that Davila was "Spooky," who was Barrales's drug connection and supposed to bring them more crank.

Appellant testified Davila pulled out of the parking lot and followed Vega's car, and "everything just happened so quick." Appellant did not know what Barrales told Davila, but Davila followed Vega's car through traffic. Appellant put on his shoes during the chase, found the knife inside the shoes, and placed the knife back in his pocket. Barrales laughed at appellant because his nose was broken in the fight.

Davila accelerated and swerved between lanes as he chased Vega's car through traffic. Appellant recalled that both cars stopped at the red light at Peach and Belmont. Appellant tried to get out of the car because he was angry, he thought it was an opportunity to get even with the guy who beat him up, and he wanted to hurt and get back at that guy. His knife was in his pocket. He started to get out of the car but

the light changed. Davila accelerated and the chase continued.

Appellant testified both cars stopped at another red light at Belmont and Clovis. Appellant got out of the passenger side of Davila's car and headed toward the white car. Appellant took the knife out of his pocket as he ran toward the white car. Appellant admitted he ran to the white car, leaned into the open front passenger window, and stabbed the occupant of the front passenger seat in the chest with his kitchen knife.

Appellant did not know who was sitting in the front passenger seat when he stabbed the man. Appellant meant to sock the occupant with his fist and run away, and that would make them even. He did not intend to kill Mendez, and he was never angry with Mendez. "I was mad.... I wasn't mad at Mendez, but I was mad."

Appellant insisted he did not intend to stab anyone. "In fact, I didn't even intend to stab him. It just-out of my-what I felt, my rage and all that, I guess that's what led to stabbing." "I was angry. I had no intentions, was just angry." Appellant did not know who was sitting in the front passenger seat, but "just went up to the car. I don't remember. I don't know who I was going to go for. I just went to the car and stabbed him."

"Q What were you hoping to accomplish by sticking your arm with that knife through the window?

"A I was-I guess you could say was trying to accomplish nothing because I-I didn't think.

"Q What were you thinking about?

"A I was just angry."

Appellant insisted his rage had nothing to do with any gang activity. "It was just a personal thing." "It was just about him being-feeling disrespected because I socked him. That's about it."

"Q So you ran up to the car, you were going to sock the guy and somehow the knife got into your hand?

"A No. The hand was in my-the hand-the knife was in my pocket so I reached-once I got up there, I just said-pulled it out.

"Q But you weren't up there just to sock him?

"A. No. I went up there to assault him. [¶] ... [¶] ... I went up to the car and I was going to sock him, but once at the car, I reached for my knife and I stuck him.

"Q Well, why did you do that? Why did you pull the knife out?

"A I just pulled it out.

"Q Okay. So your intent was to sock him, but instead you pulled out the knife and stabbed him?

"A Right."

Appellant admitted he held the white car's door frame with his left hand as he stabbed Mendez with his right hand, but denied that he held onto the car to steady himself so he could stab the victim. Appellant insisted that he held onto the car with his left hand because he was worried the car was going to move. He admitted the knife was stuck in Mendez's chest but denied that he meant to stab him that hard.

"Q But when you put your hand on the door, that steadied yourself, didn't it?

"A You could say that. [¶] ... [¶]

"Q ... The reason you put the-your hand on that car was to steady yourself and have a ground so you could stab him harder; isn't that correct?

"A I don't know."

Appellant did not try to remove the knife from Mendez's chest because everything happened quickly and he was scared. Appellant concurred with Mendez's testimony, that he looked kind of shocked when he leaned into the car and stabbed Mendez. "I just paused. I froze because I couldn't believe what I had done ... I got scared."

Appellant immediately returned to Davila's car after he stabbed Mendez. Barrales was also running back to Davila's car, and appellant realized Barrales had

been out of the car during the stabbing, although Barrales never made it to the white car. Appellant never said anything about a gun when he got back into Davila's car.

Davila drove away and dropped off appellant and Barrales near the fairgrounds. Davila was angry about the entire incident. Appellant never saw Davila again. Appellant testified he subsequently went to a motel with Barrales and they continued with their tattoo work.

Appellant denied that he threatened Davila for testifying against him. Appellant explained that he talked about his case with other inmates and mentioned that someone snitched on him, and Davila might have overheard the conversation. Appellant admitted, however, that he was part of the three-way telephone call with Samuel Vega shortly before trial. Appellant wanted to apologize and explain how everything happened so quickly. Appellant insisted he did not threaten Vega, but asked Vega to put himself in appellant's shoes and realize he made a mistake.

On cross-examination, appellant testified he never told Davila to follow the white car, but he wanted to follow it because "the same guy that was in there was the one that broke my nose." "It wasn't my intent [to follow it], but at the same time I didn't care if it was followed."

"Q What did you think you were going to do by following this car?
"A I was thinking, shit ... I didn't get a fair fight, shit.
"Q So you're going to even up the score?
"A Yes.
"Q You were going to stab him?
"A Not stab him."

Appellant insisted he just wanted to run up to the white car and sock the guy. He was angry and worried that same guy would get out of the car and beat him up again.

"Q But you didn't think about the knife?
"A I knew I had the knife on me."

Appellant figured he would have an opportunity to "get even" with the guy that hit him.

Appellant testified that Davila drove as fast as 50 to 60 miles per hours as he followed the white car. The entire chase from the Super 7 store to the intersection where he stabbed Mendez lasted about two to three minutes.

Appellant was convicted of attempted murder and assault with a deadly weapon, with enhancements for personal infliction of great bodily injury. The jury found the gang enhancements not true.

(Pet. Ex. B at 3-20).

## DISCUSSION

### I.   Jurisdiction and Venue

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution and Petitioner's custody arose from a conviction in the Fresno County Superior Court. Fresno County is within this judicial district. 28 U.S.C. § 84(b). As an application for writ

1  of habeas corpus may be filed in either the district court where Petitioner is currently incarcerated or

2  in the district where Petitioner was sentenced, the Court has jurisdiction over and is the proper venue

3  for this action.  *See* 28 U.S.C. § 2241(d).

4  **II.      ADEPA Standard of Review**

5          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

6  1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

7  enactment.  Lindh v. Murphy, 521 U.S. 320, 326-327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

8  (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97

9  F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by*

10  Lindh, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)).  The

11  instant petition was filed in August 2006 and is consequently governed by the provisions of the

12  AEDPA, which became effective upon the statute's enactment on April 24, 1996.  Lockyer v.

13  Andrade, 538 U.S. 63, 70 (2003).

14          As Petitioner is in custody of the California Department of Corrections and Rehabilitation

15  pursuant to a state court judgment, Title 28 U.S.C. section 2254 remains the exclusive vehicle for

16  Petitioner's habeas petition.  Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127

17  (9th Cir. 2006) (quoting White v. Lambert, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that §

18  2254 is the exclusive vehicle for a habeas petitioner in custody pursuant to a state court judgment

19  even where the petitioner is not challenging his underlying state court conviction).  Under AEDPA, a

20  petition for habeas corpus "may be granted only if he demonstrates that the state court decision

21  denying relief was 'contrary to, or involved an unreasonable application of, clearly established

22  Federal law, as determined by the Supreme Court of the United States.'" Irons v. Carey, 505 F.3d

23  846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see* Lockyer, 538 U.S. at 70-71.

24          As a threshold matter, this Court must "first decide what constitutes 'clearly established

25  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71

26  (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

27  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of

28  the time of the relevant state-court decision." Id. (quoting Williams, 592 U.S. at 412). "In other

1   words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

2   principles set forth by the Supreme Court at the time the state court renders its decision." Id.

3        Finally, this Court must consider whether the state court's decision was "contrary to, or

4   involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

5   (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant

6   the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

7   question of law or if the state court decides a case differently than [the] Court has on a set of

8   materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

9   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

10  identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

11  that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may

12  not issue the writ simply because the court concludes in its independent judgment that the relevant

13  state court decision applied clearly established federal law erroneously or incorrectly. Rather, that

14  application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable

15  application" inquiry should ask whether the state court's application of clearly established federal law

16  was "objectively unreasonable." Id. at 409.

17       Petitioner bears the burden of establishing that the state court's decision is contrary to or

18  involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

19  94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth

20  Circuit precedent remains relevant persuasive authority in determining whether a state court decision

21  is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003); Duhaime v.

22  Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

23       AEDPA requires that we give considerable deference to state court decisions. The state

24  court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

25  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), cert. denied,

26  537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

27  **III.    Review of Petitioner's Claim**

28        ***A.        Ground One***

1    In his first ground for relief, Petitioner contends that his constitutional rights were violated

2  because insufficient evidence was presented at trial to support his conviction for attempted murder.

3  (Pet. at 5).  This claim was presented on direct appeal to the California Court of Appeal, Fifth

4  Appellate District.  The state appellate court issued a reasoned decision affirming Petitioner's

5  conviction and rejecting his sufficiency of the evidence claim.  (*See* Pet. Ex. B ).  Petitioner's

6  subsequent petition for review before the California Supreme Court was summarily denied.  (*See* Pet.

7  Ex. A).  When reviewing a state court's summary denial, the Court "look[s] through" the summary

8  disposition to the last reasoned decision.  *See* Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th

9  Cir. 2000) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991)).  Thus, the California Supreme

10 Court is presumed to have adjudicated this claim for the same reasons cited by the California Court

11 of Appeal in their reasoned denial of Petitioner's claim.  *See* Ylst v. Nunnemaker, 501 U.S. at 803.

12   In reviewing sufficiency of evidence claims, California courts expressly follow the standard

13 articulated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *See*

14 People v. Smith, 37 Cal.4th 733, 738-739 (Cal. 2005); *see also* People v. Catlin, 26 Cal.4th 81, 139

15 (Cal. 2001).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

16 the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

17 Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005) (noting under AEDPA, a petition for habeas

18 corpus may only be granted where the state court's application of *Jackson* was objectively

19 unreasonable), *cert. denied*, Allen v. Juan H., 546 U.S. 1137 (2006).  Pursuant to the Supreme

20 Court's holding in *Jackson*, the test to determine whether a factual finding is fairly supported by the

21 record is as follows, "whether, after reviewing the evidence in the light most favorable to the

22 prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

23 reasonable doubt."  Jackson, 443 U.S. at 319; *see also* Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

24   Sufficiency of evidence claims are judged by "the substantive elements of the criminal

25 offense as defined by state law."  Jackson, 443 U.S. at 324, n. 16.  Furthermore, this Court must

26 presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v.

27 Wilson, 477 U.S. 436, 459 (1986).  This presumption of correctness applies to state appellate

28 determinations of fact as well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d 520, 525

1    (9th Cir. 1990).  Although the presumption of correctness does not apply to state court

2    determinations of legal questions or to mixed questions of law and fact, the state court's factual

3    findings underlying those determinations are entitled to the same presumption.  Sumner v. Mata, 455

4    U.S. 539, 597 (1981).

5         In California, an attempted murder conviction requires "sufficient evidence of the intent to

6    commit the murder plus a direct but ineffectual act towards its commission."  People v. Morales, 5

7    Cal.App.4th 917, 925 (Cal. Ct. App. 1992) (citing People v. Dillon, 34 Cal.3d 441, 452 (Cal. 1983));

8    see also People v. Lee, 31 Cal.4th 613, 623-624 (Cal. 2003) (stating that, "[a]ttempted murder

9    requires specific intent to kill and the commission of a direct but ineffectual act toward

10   accomplishing the intended killing").  Here, Petitioner does not allege that there was insufficient

11   evidence as to both elements.  Rather, Petitioner solely challenges the sufficiency of the evidence

12   pertaining to the mental intent required for attempted murder.  The requisite mental state for

13   attempted murder is distinct from that required for murder as a specific intent to kill the actual victim

14   is required.  Consequently the doctrine of "transferred intent" is inapplicable for attempted murder.

15   People v. Bland, 28 Cal.4th 313, 328 (Cal. 2002).  Thus, "[t]o be guilty of attempted murder, the

16   defendant must intend to the kill the alleged victim, not someone else."  Id.

17        Petitioner argues that the "zone of harm" theory relied upon by the appellate court was not

18   applicable since Petitioner used a knife and the intended victim, Mr. Vega, was not within reaching

19   distance when Petitioner stabbed the actual victim, Mr. Mendez.  (Pet. at 5).  Petitioner contends that

20   he intended to kill Mr. Vega and not Mr. Mendez and thus did not posses the mental intent required

21   for attempted murder of Mr. Mendez.  However, California courts recognize that the doctrine of

22   concurrent intent–namely, a primary intent to kill a specific victim does not eliminate the possibility

23   that a criminal defendant also harbors a concurrent intent to kill another.  Bland, 28 Cal.4th at 331.

24   Pursuant to this doctrine, the requisite mental state for attempted murder can be inferred "when the

25   nature and scope of the attack, while directed at a primary victim, are such that we can conclude the

26   perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's

27   vicinity."  Id. at 329.  Thus, where "[t]he defendant has intentionally created a kill zone to ensure the

28   death of his primary victim...the trier of fact may reasonably infer from the method employed an

1    intent to kill others concurrent with the intent to kill the primary victim.'" Id. at 330 (quoting Ford v.

2    State, 625 A.2d 984, 1001 (Md. 1993))(citation marks omitted).

3          Petitioner's argues that the doctrine of concurrent intent is inapplicable to his situation as

4    stabbing one person cannot have created a "zone of harm."  In essence, Petitioner asks the Court to

5    find that the state appellate court incorrectly applied state law to his case.  The Supreme Court has

6    continually "reemphasize[d] that is not the province of a federal habeas court to reexamine state-

7    court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

8    Furthermore, AEDPA requires that we give considerable deference to the state court's interpretation

9    of its law.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002) (holding that a federal habeas court

10   is bound by a state's interpretation of its own laws), *cert. denied*, 537 U.S. 859 (2002), *rehearing*

11   *denied*, 537 U.S. 1149 (2003).  Thus, the Court reject's Petitioner's argument that the state appellate

12   court's application of state law, the concurrent intent doctrine, was erroneous.

13         However, the Court notes that sufficient evidence existed to support Petitioner's conviction

14   regardless of whether the state appellate court had erred.  In addition to this doctrine of concurrent

15   intent, the California Supreme Court has noted that in a situation similar to the one presented here,

16   the lack of a motive does not equate a lack of specific intent to kill the actual victim. *See* Smith, 37

17   Cal.4th at 742-746.  In *Smith*, the California Supreme Court concluded that where a defendant fired

18   one bullet at two people, the defendant could be guilty of attempted murder of both even where he

19   had a motive to kill only one.  Id. at 744-745.  Thus, even where a defendant's motive for killing the

20   victim is not evident, the specific intent to kill that victim may be inferred by the circumstances of

21   the crime.  Id. at 741 (noting that "it is well settled that intent to kill or express malice, the mental

22   state required to convict a defendant of attempted murder, may in many cases be inferred from the

23   defendant's acts and the circumstances of the crime").

24         Here, the Court's review of the record discloses sufficient, credible evidence from which the

25   jury could reasonably concluded that Petitioner specifically intended to kill Mr. Mendez.  Mrs.

26   Mendez testified that immediately after the physical altercation between Mr. Vega and Petitioner, the

27   car Petitioner was in engaged in a high speed pursuit of the white Chevrolet, containing Mr. Mendez

28   and Mr. Vega.  (RT at 1257-1260).  Mrs. Mendez testified that someone from Petitioner's vehicle

1  attempted to approach the white Chevrolet when it was stopped at Peach and Belmont. (Id). She

2  also testified that Petitioner exited his vehicle, ran up to the passenger side of the white Chevrolet,

3  extended his head an hand in the open window, and stabbed Mr. Mendez. (Id. at 1261-1263).

4      Mr. Mendez similarly testified as to the car chase. (Id. at 1330-1334). Mr. Mendez further

5  testified that Petitioner ran the distance of a one and a half car lengths to the victim's vehicle. (Id. at

6  1335). Mr. Mendez stated that the wound inflicted by the Petitioner was hard enough to sever an

7  artery and to pierce Mr. Mendez's pericardium. Lastly, Mr. Mendez testified that during the

8  stabbing, Petitioner gripped the side of the door and proceeded to stab Mr. Mendez through the open

9  window. (Id. at 1357). This testimony was also supported by that of Mr. Vega. Mr. Vega testified

10 that he saw Petitioner jump out of his vehicle on Peach and Belmont and attempt to approach the

11 vehicle carrying the victims. (Id. at 1380). Mr. Vega also testified that he saw Petitioner run to the

12 passenger side of the white Chevrolet Mr. Vega was in, hold onto the car, and swing him arm into

13 the car. (Id. at 1385).

14     Jose Davila, the driver of the car Petitioner was in, testified that Petitioner gave a false story

15 to induce him to chase the white Chevrolet–stating that both Petitioner and Mr. Barrales told him

16 that Petitioner's wallet had been stolen by the people in the white Chevrolet. (Id. at 1509-1510).

17 Petitioner himself testified that he did not know who was sitting in the front passenger seat when he

18 ran towards the white Chevrolet. (Id. at 1768). He specifically stated, he didn't "know who he was

19 going to go for." (Id). Petitioner acknowledged that he attempted to get to the white Chevrolet at

20 Peach and Belmont. (Id. at 1857-1858). More incriminating however was Petitioner's statement that

21 he reached into his pocket, pulled the knife out, steadied himself against the car door, and stabbed

22 Mr. Mendez. (Id. at 1862-1865). While Petitioner testified that he only intended to sock the person

23 in the front passenger seat, Petitioner also admitted that he stabbed the victim rather than attempt to

24 merely cut him. (Id. at 1865).

25     In looking at the evidence in a light most favorable to the verdict, it is clear there was

26 sufficient evidence for a reasonable jurist to find Petitioner possessed the requisite mental intent for

27 attempted murder. The most damning evidence is Petitioner's own testimony that he did not know

28 who was sitting the front passenger seat and he did not know who he was "going to go for." These

1    statements by Petitioner preclude the theory that Petitioner intended to stab Mr. Vega but instead got

2    Mr. Mendez.  Rather, those statements, combined with the testimony regarding Petitioner running to

3    the car, steadying himself once he arrived at the front passenger window, and thrusting the knife into

4    the chest of Mr. Mendez hard enough to embed it into Mr. Mendez's chest and to perforate his

5    pericardium as opposed to merely cutting him, evidences a specific intent to kill the front passenger.

6    As a reasonable jury could have inferred the specific intent, despite a lack of motive, to kill Mr.

7    Mendez from the circumstances of the crime, Petitioner's sufficiency of the evidence claim is

8    rejected.

9            **_B._**      **_Ground Two_**

10           Petitioner asserts as his second ground for relief that the trial court's failure to _sua sponte_

11   instruct the jury on the lesser included offense of attempted voluntary manslaughter violated his

12   constitutional right to due process of the law.  This claim was raised on direct appeal to the

13   California Court of Appeal, which issued a reasoned opinion affirming Petitioner's conviction.  (_See_

14   Pet. Ex. B).  Petitioner presented this claim to the California Supreme Court in a petition for review,

15   which the state high court summarily denied.  (_See_ Pet. Ex. A).  In issuing a summary denial of

16   Petitioner's claim, the California Supreme Court is presumed to have adjudicated this claim on the

17   same grounds set forth in the opinion of the state appellate court.  _See_ Ylst v. Nunnemaker, 501 U.S.

18   at 803.  The California Court of Appeal found that a jury instruction on the lesser included offense of

19   attempted voluntary manslaughter was not warranted by the evidence.  (_See_ Pet. Ex. B at 27-35).

20   The appellate court concluded that the desire for vengeance against Mr. Vega did not constitute

21   adequate provocation or heat of passion as to require a jury instruction for attempted voluntary

22   manslaughter.  (Id. at 31-32).

23           As an initial matter, the Court notes that in a non-capital case, such as the one presented here,

24   the "[f]ailure of a state court to instruct on a lesser offense fails to present a federal constitutional

25   question and will not be considered in a federal habeas corpus proceeding."  Bashor v. Risley, 730

26   F.2d 1228, 1240 (9th Cir. 1984) (quoting James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976) (_per_

27   _curiam_)).  While the United States Supreme Court, in _Beck v. Alabama_, 447 U.S. 625, 638 (1980),

28   has held that criminal defendants possess a constitutional right to have the jury instructed on a lesser

1   included offense in a capital murder case, the *Beck* court also expressly reserved the question of

2   whether due process mandates the application of the same right in a non-capital case. *See* Beck, 447

3   U.S. at 638, n.7; Solis v. Garcia, 219 F.3d 922, 928 (9th Cir. 2000). Thus, in a non-capital case, the

4   failure of a trial court to *sua sponte* instruct on a lesser included offense does not present a federal

5   constitutional question that would warrant habeas corpus relief. Windham v. Merkle, 163 F.3d 1092,

6   1106 (9th Cir. 1998); Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995), *overruled on other*

7   *grounds* by Tolbert v Page, 182 F.3d 677 (9th Cir.1999) (*en banc*) (finding the application of Beck to

8   noncapital cases barred by Teague v. Lane, 498 U.S. 288, 299-300 (1989)); James v. Reese, 546

9   F.2d 325, 327 (9th Cir. 1976) (*per curiam*).

10          The Ninth Circuit in *Solis* noted that there might exist an exception to this general rule for

11  adequate jury instructions on a defendant's theory of defense. Solis, 219 F.3d at 929 (citing Bashor,

12  730 F.2d at 1240, but noting that Wyndham, 163 F.3d at 1106, mentioned no such exception to the

13  general rule). Assuming *arguendo* that Petitioner possesses a federal constitutional right to receive

14  adequate instructions on his theory of the case, the state appellate court's conclusion that the

15  evidence did not warrant such an instruction was not objectively unreasonable. *See* Solis, 219 F.3d

16  at 929 (finding habeas petitioner not entitled to relief even under the exception where evidence to

17  support lesser included offenses was not substantial).

18          California's Supreme Court found that an instruction of a lesser included offense is required

19  only where "the evidence is substantial enough to merit consideration by the jury." People v. Barton,

20  12 Cal.4th 186, 195 n. 4 (Cal. 1995). Evidence is substantial where reasonable jury members could

21  come to the conclusion that the lesser offense, here attempted voluntary manslaughter, but not the

22  greater offense had been committed. *See* People v. Ochoa, 19 Cal.4th 353, 422 (Cal. 1998).

23  Attempted voluntary manslaughter requires both heat of passion and provocation–specifically,

24  requiring that Petitioner's "reason was actually obscured as the result of a strong passion aroused by

25  a provocation sufficient to cause an ordinary person of average disposition to act rashly or without

26  due deliberation and reflection, and from this passion rather than from judgment." People v.

27  Breverman, 19 Cal.4th 142, 163 (Cal. 1998). While Petitioner does not state what provocation/heat

28  of passion existed in his case, the brief submitted to the California Supreme Court argued that

1  Petitioner was blinded by his rage stemming from his humiliation at the outcome of his physical

2  alteration with Mr. Vega.  (Pet. Ex. A at 14).  California has long rejected  revenge as a sufficient

3  provocation or heat of passion.  <u>People v. Lasko</u>, 23 Cal.4th 101, 108 (Cal. 2000); <u>Breverman</u>, 19

4  Cal.4th at 163 (quoting <u>People v. Wickersham</u>, 32 Cal.3d 307, 327 (Cal. 1982)).  Petitioner himself

5  admitted at trial that his pursuit of the Mendez's car was to "even up the score" with Mr. Vega.  (RT

6  at 1851).  As there did not exist substantial evidence warranting the issuance of a jury instruction for

7  attempted voluntary manslaughter, the appellate court's rejection of this claim was not objectively

8  unreasonable.  Consequently,  Petitioner has failed to establish any grounds for which he is entitled

9  to habeas corpus relief.

10  **<u>RECOMMENDATION</u>**

11  Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

12  DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

13  Respondent.

14  This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

15  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

16  of the Local Rules of Practice for the United States District Court, Eastern District of California.

17  Within thirty (30) days after being served with a copy, any party may file written objections with the

18  court and serve a copy on all parties.  Such a document should be captioned "Objections to

19  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

20  filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.

21  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The

22  parties are advised that failure to file objections within the specified time may waive the right to

23  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

24

25  IT IS SO ORDERED.

26  **Dated:   February 2, 2009**            **/s/ John M. Dixon**
                                        UNITED STATES MAGISTRATE JUDGE

27

28